Harvey S. Farrow, Sr. v. Commissioner.
Farrow v. Commissioner
Docket Nos. 59371, 65834.
United States Tax Court
T.C. Memo 1957-188; 1957 Tax Ct. Memo LEXIS 65; 16 T.C.M. (CCH) 836; T.C.M. (RIA) 57188; September 30, 1957
David C. Moore, Esq., 8100 duPont Building, Wilmington, Del., for the petitioner. Albert Squire, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined deficiencies in income tax against the petitioner for the years 1952 and 1953 in the respective amounts of $1,274.27 and $945.10. The only question presented is whether losses the petitioner sustained in 1952 and 1953 in the operation of his farm were incurred in a trade or business, so as to be deductible under section 23(a) of the Internal Revenue Code of 1939. Other issues raised by the pleadings have been abandoned or settled. Findings of Fact Petitioner, an individual, is a resident of Clayton, Delaware. He filed his income tax return for the taxable year 1952 *66 with the director and for the taxable year 1953 with the district director of internal revenue for Delaware. Petitioner was born in 1885. On January 1, 1907, he began working for the E. I. duPont de Nemours Company, in Wilmington, Delaware. At that time, he was married and had one child. Eight other children were born of the marriage, with seven living. Petitioner's wife had been an invalid for several years prior to her death on March 10, 1947, and on some undisclosed date the oldest daughter had given up her position in order to keep house for petitioner and his family. Later she married Ray Williams, and with her husband continued to live with the family. At various times petitioner had raised poultry on a small scale, and had always had a desire to see what could be done in such a business. Where the operation also included growing of feed. By reading Government literature on the subject and talking with people who had had chicken farming experience, he attempted to inform himself in the modern way of raising poultry and producing eggs. An important factor in such studies and in his planning, was the fact that under the duPont Company pension plan he would be required to retire *67 by December 31, 1950, 1950 being the year in which his sixty-fifth birthday would fall. His pension would be less than one-half of his salary, and he was hopeful that he could supplement his income through the raising of poultry and the production of eggs. In 1947, he saw an advertisement in the Wilmington paper that a farm located at Clayton, Delaware, about thirty-five miles south of Wilmington, was for sale. The farm consisted of approximately 64 acres, about 25 acres of which were woodland and 30 acres, consisting of two fields of 15 acres each, were available for cultivation. The other nine acres were occupied by buildings and devoted to miscellaneous uses. The buildings consisted of a main house, a tenant house, an airplane hangar, a barn, a swimming pool, and some other buildings. There were no chicken houses on the property. He visited the above farm several times, and conferred with Ray, his son-in-law, with respect to the property. They concluded that the farm would be suitable for raising poultry and that there would be sufficient ground on which to grow the necessary feed therefor. Petitioner purchased the property on December 4, 1947. Petitioner, with his daughter, *68 her husband, Ray, and their three children, moved to the farm in May 1948. They resided in the main house. In June 1950, another daughter, with her husband, Robert Thomas Robinson, and their four children, moved to the farm on a permanent basis. Robert was interested in working around a farm and thought it would be a good place for the children. Ray had full-time work as an electrician, and Robert was assistant manager of the car operating division of the traffic department of the duPont Company. Ray and Robert were to pay no rent, but were to help petitioner in their spare time. When the operation of the farm reached a profitable basis both were to share in the profits. After the acquisition of the property the first three or four years were devoted primarily to making repairs, remodeling old buildings and constructing new buildings. At first, petitioner and his sons-in-law worked at the farm on week ends, holidays and vacation periods. Upon moving to the farm, they did additional work during the evenings after returning from their respective jobs. Robert usually left the farm at 6:45 A.M., so as to be at his office by 8 o'clock, and when he left the office at 5 P.M., he arrived *69 at the farm around 6:15. Petitioner had the month of June in 1949 for a vacation and during the last half of 1949 his work with the duPont Company was on an advisory basis. This permitted him to have practically seven months of free time which he was able to devote to the farm. Because of an ulcer, and for the further reason that to continue work meant only a small additional amount to his pension, petitioner retired on December 31, 1949, instead of awaiting automatic retirement at December 31, 1950. One of the first improvements made was to the main house. When it was acquired it was in fairly good condition. It contained a living room, about 31 feet by 15 feet, a combination kitchen-dining room, and a laundry room on the first floor. On the second floor it had two bedrooms and two baths. The house also contained a half bath. During 1948 and 1949 petitioner expended $5,535 on materials for improving the house. A former owner of the farm had owned a small airplane and he had constructed a hangar in which to house it. The hangar was a mere shed, with clapboard sides and a dirt floor, and was in poor condition when the petitioner purchased the farm. Petitioner converted the hangar *70 into a usable cottage during 1948 and 1949, in order to take care of occasional guests, as there was no room for them in the main house. This improvement cost petitioner $2,288.94. Robert and his family lived in this building for a short time, while awaiting remodeling of the tenant house. The tenant house originally had only three rooms. There was running water but no kitchen or bath. The improvements were completed in 1950, at a cost of $1,884.40. The barn on the farm was in good condition, but the petitioner made some changes in it, so that it would be more suitable for the storage of grain and other things. Petitioner's depreciation basis on the barn was $3,523.75. During 1949 and 1950 the petitioner expended $3,380.67 on the construction of a garage-machine shop. This building housed automobiles, a jeep, tractors, and other machinery. A wagon shed was also constructed, at a cost of $676.02. Buildings that were constructed by petitioner and his sons-in-law for poultry raising purposes consisted of the following: Cost
Brooder House
$ 437.86
Poultry House A
1,861.22
Poultry House B
701.71
Turkey House
724.10
In the construction work the installation *71 of concrete foundations and concrete blocks was done by hired labor. The woodwork, such as framing of the second floor of the main house, joists and similar things, was done by the petitioner and his two sons-in-law. Petitioner did about 50 per cent of the woodwork. Woodworking had been a hobby with him for a number of years. Because of the remodeling and repairing of the old buildings and construction of new buildings, petitioner did not really "get down" to farming until the fall of 1950. Petitioner had no farm machinery or implements before he moved to the farm. On June 15, 1948, he purchased a small tractor for $1,182. He found it to be inadequate, however, and in May of 1950 traded it in on a larger but used tractor, with a payment of $600 in cash. Other machinery and equipment purchased by the petitioner consisted of the following: Date
Kind of Property
Cost
1- 1-50
Jeep (Tractor) - used
$ 958.00
1- 1-50
Power Sprayer - new
195.00
1- 1-50
Cement Mixer - new
88.95
9-11-50
Mower - used
65.00
11-18-50
Saw Table - new
50.00
10- 7-50
Poultry Equipment - new
95.15
11- 6-51
Poultry Equipment - new
161.20
11- 1-51
Refrigerator for eggs - used
200.00
4- 9-51
Power Seeder - new
50.00
4-10-51
Corn Planter - new
194.15
5- 2-51
Farm Wagon - new
218.13
2- 5-52
M & M Tractor and Cultiva-
tors - used
2,000.00
4-13-52
DB 16 in. Plow - new
274.00
4-13-52
Spg. Tooth Harrow - new
104.00
4-13-52
Spike Harrow - new
65.00
4-13-52
Disc Harrow - new
$ 340.00
4-19-52
Seed Drill - used
300.00
5- 3-52
DB 12 in. Plow - used
210.00
6-25-52
Bolen Tractor and attach-
ments (weedcutter) - new
275.00
9-20-52
Oliver 77 Tractor and Culti-
vators - used
1,900.00
4-29-53
Plow Packers - new
195.00
Total
$7,920.58
*72 Petitioner purchased a new Plymouth station wagon on March 20, 1953, at a cost of $2,506.90, 40 per cent of which was charged to farm business. In 1952 and 1953, he bought various small tools in the respective amounts of $38.30 and $23.25, and for each of the years took depreciation on "fencing" in the amount of $96. Petitioner borrowed part of the money expended on the farm buildings and equipment, and at the time of the trial herein some of the notes were still unpaid. As to one of the fields, the petitioner found that it would be necessary to remove a growth of young cedar, gum and swamp oak trees thereon, if the land was to be used to produce crops. The other field had lain fallow for many years. Both fields required considerable work to put them in condition for growing crops. The trees had to be uprooted and cleared away on the one, and the fallow land had to be fertilized and tilled over a period of time to put life back into the soil. The work of removing the small trees and clearing the field for cultivation was done in 1950, such work being done primarily by Ray and Robert. The petitioner could not drive a tractor, but he helped in other ways. At his age, he could not *73 do heavy farm work. Ray and Robert did the cultivating of the land and the planting of the seed. Some rye grass was planted in the fall of 1950 as a cover crop. Some corn and oats were planted in 1951 and some seed oats and seed wheat were planted in 1952. This was on the field that had been fallow, the other field not being in cultivation. In 1950 or 1951, one of the neighboring farmers put in a crop of soya beans, on a share basis. The 1952 harvest was not good. A certain type of feed required could not be produced on the farm and had to be bought. Any surplus of the feed raised on the farm was sold. Petitioner's primary purpose in acquiring the farm being to raise poultry and produce eggs, he began stocking the place with young chickens in the fall of 1950, in order to have some egg production in 1951. He thought he might ultimately have from 2,500 to 3,000 laying hens, with a rotation replacement every two years, so as to have the hens at the height of their productivity. This would have required the building of four or five more poultry houses. Petitioner expected to have a loss the first year or two, but with more experience and with improvement in soil conditions he had *74 felt the loss would diminish, and then he expected to make a success of his farming operation. In the larger of the two chicken houses built, 225 to 250 chickens could be accommodated in one laying season, and 50 to 75 could be accommodated in the smaller house. About 325 chickens were the most that petitioner had at any time, and that was in 1953. During 1952 and 1953 the price of eggs was poor, the weather was not good, and the petitioner lost a large number of his laying hens because of extremely hot, dry weather. He made sales of eggs to different stores and individuals in and around Smyrna and Clayton. In this business, he used stationery with the letterhead "Bob White Farm." He also used a rubber stamp bearing a similar heading on a standard type of egg carton. Petitioner raised turkeys for two years. Since the turkeys had to be oven-dressed for marketing, he had to dress them. During one week he dressed about 150 turkeys and after peddling them to individuals and to the duPont Country Club made a net profit of $50. In 1954 petitioner's egg production was about one-sixth of his 1953 production, principally because he had acquired some bad White Rock layers. In prior years *75 he had had Rhode Island Red and New Hampshire chickens. The White Rocks were supposed to be of good strain, but those acquired were not good as egg producers. Had it not been for the White Rocks, petitioner might have broken even or made a small profit in 1954. Petitioner had discovered that in order to make a success of farming in his area he should have had considerably more acreage for the raising of grain, and with his failure in the production of eggs, he concluded he was not a farmer. He had not made a profit during any of the years 1950 through 1954. At the end of the year 1954 he discontinued farming. He has since sold all of his farming equipment, and has put the farm up for sale. At the time of the trial herein, he had granted an option to purchase the property to a prospective buyer. In February 1956, Robert, with his family, moved from the farm to Claymont, Delaware, which is only a short distance from his work at the duPont Company plant. Petitioner kept his own books on his farming and poultry raising activities. During 1952 his sales of poultry and eggs amounted to $2,296.79, but, with operating costs, including depreciation, of $5,895.64, he had a farm loss of *76 $3,598.85. In 1953 his sales of farm products amounted to $2,912.88, and his operating costs, including depreciation, were $4,849.83, resulting in a farm loss of $1,936.95. The losses incurred were restricted to the operation of the farm and there was no connection between them and petitioner's personal or living expenses, or the expenses of running his home. During the taxable years 1952 and 1953 the petitioner was engaged in the business of farming for profit. Opinion The only question for decision is whether the petitioner was engaged in the business of farming for profit during the years herein, so as to entitle him to deductions for the losses sustained in the operation thereof. The parties are in agreement that if the question is decided for the petitioner, his farm losses for the taxable years 1952 and 1953 were $3,598.85 and $1,936.95, respectively. It is the respondent's position that the petitioner acquired the farm property and used it for a comfortable country residence for himself and the families of two of his children, and that the farming done was only as an incidental by-product of such use and was not a business carried on with a profit motive. While there *77 are some circumstances which standing alone might support the respondent's contention, we are convinced from the evidence that the petitioner at all times intended to operate the property acquired as a poultry farm, and for profit. He was seeking a profitable endeavor in order to supplement his retirement income, and thought poultry farming might be the answer to his problem. He studied Government literature on the subject and discussed the matter with people with experience in such operations. He devoted most, if not all, of his working hours after retirement to the preparation and operation of the farm for the desired purpose and to the raising, selling and delivering of poultry and eggs. His purchases of equipment were not indicative of an incidental or diversionary activity, but of a purpose to conduct a business, and when he became convinced he could not make a success of the venture, he discontinued it, selling his farm machinery and implements and putting his property on the market for sale. While he did furnish residence for himself and for the families of two of his children, that in itself does not negate the intent to operate the farm for profit. He obtained material assistance *78 from his two sons-in-law, not only in repairing and remodeling the old buildings and constructing new buildings on the property, but they did the heavy farm work which produced the crops that were actually raised. It is true the petitioner suffered losses during the operation of the farm, but that is not controlling if his real purpose was the conduct of the operation for profit. Norton L. Smith, 9 T.C. 1150. The losses were being diminished through knowledge and experience, as petitioner had expected, but it was also his experience and the knowledge gained that led him to the conclusion that he would not be able to put the venture on a profit basis and caused him to discontinue the business, dispose of his farm machinery and implements, and put his property on the market for sale. It is apparent that this is not a case of a "gentleman's farm loss," or that of farming as a hobby. The expenses incurred during the taxable years were restricted to the operation of the farm. They had no connection with petitioner's residence or with his living expenses. We are convinced that the petitioner was attempting to conduct a poultry farm for profit, and so hold. Decisions will *79 be entered under Rule 50.